**BURSOR & FISHER, P.A.**
L. Timothy Fisher (SBN 191626)
1990 N. California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHELLI FRENCH, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>NEUTROGENA CORPORATION,<br><br>Defendant. | Case No.   2:21-cv-5048<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Shelli French ("Plaintiff") brings this action on behalf of herself and all others similarly situated against Defendant Neutrogena Corporation ("Neutrogena" or "Defendant").  Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to herself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action lawsuit regarding Defendant's manufacturing, distribution and sale of Neutrogena sunscreen products (the "Products") that contain dangerously high levels of benzene, a carcinogenic impurity that has been linked to leukemia and other cancers.

2.      The presence of benzene in the Products renders them adulterated and misbranded.  As a result, the Products are illegal to sell under federal law and therefore worthless.  *See* 21 U.S.C. § 331(a); *see also Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1085 (11th Cir. 2019); *see also In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.*, 2021 WL 222776, at *16 (D.N.J. Jan. 22, 2021).

3.      Benzene is a component of crude oil, gasoline, and cigarette smoke, and is one of the elementary petrochemicals.  The Department of Health and Human Services has determined that benzene causes cancer in humans.  Likewise, the Food and Drug Administration ("FDA") lists benzene as a "Class 1 solvent" that "should not be employed in the manufacture of drug substances, excipients, and drug products because of [its] unacceptable toxicity."  Benzene is associated with blood cancers such as leukemia.[1]  A study from 1939 on benzene stated that "exposure over a long period of time to any concentration of benzene greater than

---

[1] National Cancer Institute, Cancer-Causing Substances, Benzene. https://www.cancer.gov/about-cancer/causes-prevention/risk/substances/benzene.

zero is not safe,"[2]  which is a comment reiterated in a 2010 review of benzene research specifically stating: "There is probably no safe level of exposure to benzene, and all exposures constitute some risk in a linear, if not supralinear, and additive fashion."[3]

4.      According to the American Cancer Society:

> IARC classifies benzene as "carcinogenic to humans," based on sufficient evidence that benzene causes acute myeloid leukemia (AML). IARC also notes that benzene exposure has been linked with acute lymphocytic leukemia (ALL), chronic lymphocytic leukemia (CLL), multiple myeloma, and non-Hodgkin lymphoma.[4]

5.      Moreover, "[d]irect exposure of the eyes, skin, or lungs to benzene can cause tissue injury and irritation."[5]

6.      According to the National Institute for Occupational Safety and Health, humans can become exposed to benzene through "inhalation, **skin absorption**, ingestion, **skin** and/or eye contact."[6]  Skin absorption is particularly concerning as there have been multiple FDA studies showing that structurally similar chemicals in sunscreen products are found in the blood at high levels after application to exposed skin.

---

[2] Hunter, F.T. (1939). Chronic Exposure to Benzene (Benzol). II. The Clinical Effects. *Journal of Industrial Hygiene and Toxicology*. 1939 Vol.21 pp.331-54 (https://www.cabdirect.org/cabdirect/abstract/19402700388)

[3] Smith, Martyn T. (2010). Advances in Understanding Benzene Health Effects and Susceptibility. *Annual Review of Public Health*. 2010 Vol. 31:133-148 (https://www.annualreviews.org/doi/full/10.1146/annurev.publhealth.012809.1036 46)

[4] American Cancer Society. Benzene and Cancer Risk (January 5, 2016) (https://www.cancer.org/cancer/cancer-causes/benzene.html)

[5] Centers for Disease Control and Prevention, Facts About Benzene, https://emergency.cdc.gov/agent/benzene/basics/facts.asp.

[6] National Institute for Occupational Safety and Health (NIOSH), Benzene, https://www.cdc.gov/niosh/npg/npgd0049.html.

7.     Defendant manufactures, markets, and sells a variety of Neutrogena sunscreen products, including:

- Neutrogena Ultra Sheer Weightless Sunscreen Spray, SPF 100+
- Neutrogena Ultra Sheer Weightless Sunscreen Spray, SPF 70
- Neutrogena Beach Defense Oil-Free Body Sunscreen Spray-SPF 100
- Neutrogena Invisible Daily Defense Body Sunscreen Broad Spectrum SPF 60+
- Neutrogena Beach Defense Spray Body Sunscreen SPF 50

8.     Skin cancer is the most common form of cancer in the United States. About 4.3 million people are treated for basal cell cancer and squamous cell skin cancer in this country every year.[7]

9.     Accordingly, the FDA routinely evaluates sunscreen products to ensure that they are safe and effective, and to ensure that the sunscreens adequately protect consumers from skin cancer when used as directed.[8]

10.     In fact, because sunscreen products make representations that they help prevent sunburn and decrease the risks of cancer and early skin aging, such products are classified as drugs by the FDA, which subjects them to certain safety and effectiveness standards.

11.     Thus, the presence of any known human carcinogen in consumer products, like sunscreens, that are so regularly used by adults and children to prevent skin cancer would be especially concerning and would affect a substantial part of the population.

12.     While investigating the carcinogenic potential of active ingredients in sun care products, Valisure, an online pharmacy registered with the FDA, recently

---

[7] U.S. Food & Drug Administration, Tips to Stay Safe in the Sun: From Sunscreen to Sunglasses, https://www.fda.gov/consumers/consumer-updates/tips-stay-safe-sun-sunscreen-sunglasses?gclid=CjwKCAjwwqaGBhBKEiwAMk-FtF7PGr WAQkn3pHjD_ssT9LepBnoPftmckwxKZKCkHGVoQbjtFw4mrhoCQ2IQAvD_ BwE.

[8] *Id*.

detected high levels of benzene, a known human carcinogen, in several brands and batches of sunscreen, which, as discussed above, are considered drug products by the FDA.[9]

13.     Valisure tested Defendant's Products listed below using a sophisticated gas chromatography flame ionization test modified to follow FDA guidance for impurities detection.[10]  All of Defendant's listed products were found to contain quantities of benzene in excess of the "FDA concentration limit of 2 parts per million (ppm)."[11]

| Brand Name | Type | Description | SPF | UPC | Lot | Exp. | Active Pharmaceutical Ingredient(s) | Benzene Avg ppm | % St Dev |
|---|---|---|---|---|---|---|---|---|---|
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 100+ | 100+ | 086800100416 | 04820E04 | 2022-01 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 6.26 6.77* | 7% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 07020E01 | 2023-02 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 5.96 | 7% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 06920E01 | 2023-02 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 5.76 | 5% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 02320E01 | 2022-12 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 5.30 | 2% |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 | 100 | 086800101444 | 04721E02 | 2023-01 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 5.20 5.59* | 5% |
| Neutrogena | Spray | Invisible Daily Defense Body Sunscreen Broad Spectrum SPF 60+ | 60+ | 086800111542 | 04921E01 | 2024-01 | Avobenzone 3%, Homosalate 10%, Octisalate 5%, Octocrylene 10% | 4.65 5.27* | 4% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 100+ | 100+ | 086800100416 | 03120E02 | 2021-12 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 4.11 6.00** | 15% |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 | 100 | 086800101444 | 28020E01 | 2022-09 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 4.01 4.00* | 4% |
| Neutrogena | Spray | Beach Defense Spray Body Sunscreen SPF 50 | 50 | 086800112549 | 25520E01 | 2023-08 | Avobenzone 3%, Homosalate 10%, Octisalate 5%, Octocrylene 10% | 3.52 3.71* | 3% |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 | 100 | 086800101444 | 31420E04 | 2022-10 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 3.08 2.64* | 2% |

14.     In fact, Defendant's Products overall had the ***highest levels of benzene*** detected in the sunscreen products tested by Valisure.

---

[9] Valisure, Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care products, May 24, 2021, https://www.valisure.com/blog/valisure-news/valisure-detects-benzene-in-sunscreen/, at 1.

[10] *Id.* at 1,7.

[11] *Id.* at 12.

15.     Nevertheless, benzene is not one of the listed ingredients on the Products' labels.  For example, the label for Defendant's Neutrogena Beach Defense Oil-Free Body Sunscreen Spray – SPF 100 does not indicate to consumers that the Product may contain benzene as an ingredient:




16.     Due to the presence of phenyl groups (similar chemical structures to benzene) in the molecules of some sunscreen active ingredients, Valisure investigated the possibility of six sunscreen active ingredients (avobenzone, oxybenzone, octisalate, octinoxate, homosalate, and octocylene) forming benzene from degradation by the aforementioned GC-MS analytical method through analysis of pure reference standards at concentrations relevant to typical sunscreen products.  No substantive benzene was detected.[12]

---

[12] *Id.* at 7-8

17.     Thus, the presence of benzene in Defendant's Products appears to be *the result of contamination* (*i.e.*, a manufacturing defect), rather than a design effect.[13]

18.     According to Valisure, because the presence of benzene is the result of contamination, benzene is not unavoidable in the manufacture of sunscreens, and therefore, any significant detection of benzene in such products "should be deemed unacceptable."[14]

19.     Valisure further stated that "[s]unscreen products are typically used in many times higher volume than standard drug products like tablets or capsules, so even a relatively low concentration limit can result in very high total [benzene] exposure."[15]  Dr. Christopher Bunick, MD, PhD, and Associate Professor of Dermatology at Yale University agreed, stating:

> Considering that human skin has a large total surface area (~1.85 m2), and that ~28.5 g of sunscreen is needed per application to properly cover that skin surface, it follows then that there is not a safe level of benzene that can exist in sunscreen products. The total mass of sunscreen required to cover and protect the human body, in single daily application or repeated applications daily, means that even benzene at 0.1 ppm in a sunscreen could expose people to excessively high nanogram amounts of benzene.[16]

20.     Defendant also knew or should have known about the carcinogenic potential of benzene because it is classified as a Group 1 compound by the World Health Organization and the International Agency for Research on Cancer, thereby defining it as "carcinogenic to humans."[17]

---

[13] *Id.*

[14] *Id.* at 2.

[15] *Id.* at 16

[16] *Id.* at 17

[17] *Id.* at 1

21.    As a result of the concerning findings, on May 25, 2021, Valisure filed its citizen petition with the FDA asking the FDA to recall all batches of Defendant's Products that contained benzene on the basis that they are adulterated under Section 501 of the Federal Drug and Cosmetics Act ("FDCA") and misbranded under Section 502 of the FDCA, in violation of 21 U.S.C. § 351 and 21 U.S.C. § 352, respectively.

22.    Pursuant to 21 U.S.C. § 331(a) of the FDCA, the "introduction or delivery for introduction into interstate commerce of any food, drug, device, tobacco product, or cosmetic that is adulterated or misbranded" is categorically prohibited.

23.    Yet, as of the date of this filing, Defendant has not taken any action to remove the Products from the market, and to this day dangerous sunscreen products are continuing to be sold to unsuspecting consumers.

24.    Defendant's failure to control for benzene contamination and continued sale of its adulterated products constitutes actionable fraud.

25.    Plaintiff and the Class were injured by the full purchase price of the Products because the Products are worthless, as they are adulterated and contain harmful levels of benzene, and Defendant has failed to warn consumers of this fact. Such illegally sold products are worthless and have no value. *See Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1085 (11th Cir. 2019); *see also In re Valsartan, Losartan, & Irbesartan Prod. Liab. Litig.,* 2021 WL 222776, at *16 (D.N.J. Jan. 22, 2021) ("This Court finds that contaminated drugs are economically worthless at the point of sale by virtue of the dangerousness caused by their contamination, regardless whether the sold VCDs actually achieved the medical purpose of lowering blood pressure. Put differently, contaminated drugs, even if medically efficacious for their purpose, cannot create a benefit of the bargain because the contaminants, and their dangerous effects, were never bargained for.").

Plaintiff and class members bargained for a sunscreen product free of contaminants and dangerous substances, and were deprived the basis of their bargain when Defendant sold them a sunscreen product containing the dangerous substance benzene, which rendered the Products unmerchantable and unfit for use.

26.     As the Products expose consumers to benzene well above the legal limit, the Products are not fit for use by humans.  Plaintiff is further entitled to damages for the injury sustained in being exposed to high levels of acutely-toxic benzene, damages related to Defendant's conduct, and injunctive relief.

27.     In sum, Plaintiff seeks to recover damages because the Products are adulterated, defective, worthless, and unfit for human use due to the presence of benzene, a carcinogenic and toxic chemical impurity.

28.     Plaintiff brings this action on behalf of herself and the Class for equitable relief and to recover damages and restitution for: (i) breach of express warranty; (ii) breach of implied warranty; (iii) violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUPTA"); (iv) fraudulent concealment; and (v) unjust enrichment.

## PARTIES

29.     Plaintiff Shelli French is a resident of Hillsborough County, Florida. Ms. French has purchased a bottle of Defendant's Neutrogena Beach Defense Oil Free Body Sunscreen Spray SPF 100 approximately every three months for the past five years.  Ms. French made these purchases in-store at a Wal-Mart located at 1505 N. Dale Mabry Highway, Tampa, FL 33607.  Ms. French's most recent purchase was of a bottle of the Product that was part of a batch found by Valisure to contain benzene in excess of the FDA limit.  Specifically, the Product bears the lot number 31420E04 with an expiration date of October 2022, which according to the Valisure petition, contains an average benzene level of 3.08 ppm.  When purchasing the Product, Ms. French reviewed the accompanying labels and

disclosures, and understood them as representations and warranties by the manufacturer, distributor, and pharmacy that the Product was properly manufactured, free from defects, and safe for its intended use. Ms. French relied on these representations and warranties in deciding to purchase the Product manufactured by Defendant, and these representations and warranties were part of the basis of the bargain, in that she would not have purchased the Product from Defendant if she had known that it was not, in fact, properly manufactured and free from defects.

30.     Defendant Neutrogena Corp. is a Delaware corporation with its headquarters at 5760 W 96th Street, Los Angeles, California 90045. As one of the world's leading brands of skin care hair care and cosmetics, Neutrogena Corp. distributes its products, including Neutrogena sunscreen products, throughout the United States. Neutrogena Corp.'s line of sunscreen Products, including the adulterated sunscreen purchased by Plaintiff and members of the putative class, are available at retail stores throughout Florida and the United States.

## JURISIDICTION AND VENUE

31.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

32.     This Court has personal jurisdiction over this action because Defendant maintains its principal place of business in California, and therefore is subject to general jurisdiction in the state of California.

33.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because Defendant resides in this District.

## CLASS ACTION ALLEGATIONS

34.     Plaintiff seeks to represent a class defined as all persons in the United States who purchased the Products.  Plaintiff also seeks to represent a subclass of all Class members who purchased the Products in Florida (the "Subclass")

35.     The Class and Subclass shall collectively be referred to as the "Classes."

36.     Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Classes may be expanded or narrowed by amendment to the complaint or narrowed at class certification.

37.     Specifically excluded from the Classes are Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

38.     **Numerosity.**  The members of the proposed Classes are geographically dispersed throughout the United States and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiff reasonably estimates that there are hundreds of thousands of individuals that are members of the proposed Classes. Although the precise number of proposed members are unknown to Plaintiff, the true number of members of the Classes are known by Defendant.  Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

39.   **Typicality.**  The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all members of the Classes, purchased the Products, which were worthless due to the presence of benzene, a harmful and carcinogenic chemical impurity.  The representative Plaintiff, like all members of the Classes, has been damaged by Defendant's misconduct in the very same way as the members of the Classes.  Further, the factual bases of Defendant's misconduct are common to all members of the Classes and represent a common thread of misconduct resulting in injury to all members of the Classes.

40.   **Existence and predominance of common questions of law and fact.**  Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individual members of the Classes.  These common legal and factual questions include, but are not limited to, the following:

> (a)   whether the Products manufactured by Defendant contain dangerously high levels of benzene, thereby breaching the express and implied warranties made by Defendant and making the Products unfit for human use and therefore unfit for its intended purpose;
>
> (b)   whether Defendant knew or should have known the Products contained elevated levels of benzene prior to selling it, thereby constituting fraud and/or fraudulent concealment;
>
> (c)   whether Defendant has unlawfully converted money from Plaintiff and the Classes;
>
> (d)   whether Defendant is liable to Plaintiff and the Classes for unjust enrichment;

(e) whether Defendant is liable to Plaintiff and the Classes for fraudulent concealment;

(f) whether Plaintiff and the Classes have sustained monetary loss and the proper measure of that loss;

(g) whether Plaintiff and the Classes are entitled to declaratory and injunctive relief;

(h) whether Plaintiff and the Classes are entitled to restitution and disgorgement from Defendant; and

(i) whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive.

41. **Adequacy of Representation.** Plaintiff will fairly and adequately protect the interests of the Classes. Plaintiff has retained counsel who are highly experienced in complex consumer class action litigation, and Plaintiff intends to vigorously prosecute this action on behalf of the Classes. Plaintiff has no interests that are antagonistic to those of the Classes.

42. **Superiority.** A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by members of the Classes are relatively small compared to the burden and expense of individual litigation of their claims against Defendant. It would, thus, be virtually impossible for members of the Classes, on an individual basis, to obtain effective redress for the wrongs committed against them. Furthermore, even if members of the Classes could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these

issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

43. In the alternative, the Classes may be certified because:

(a) the prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes that would establish incompatible standards of conduct for the Defendant;

(b) the prosecution of separate actions by individual members of the Classes would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c) Defendant has acted or refused to act on grounds generally applicable to the Classes as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

## CAUSES OF ACTION

## COUNT I
**Breach Of Express Warranty**

44. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above as though fully set forth herein.

45. Plaintiff brings this claim individually and behalf of the members of the proposed Classes against Defendant.

46. In connection with the sale of the Products, Defendant, as the designer, manufacturer, marketer, distributor, and/or seller issued written warranties by representing that the Products were sunscreens that contained only those active and inactive ingredients listed on the Products' labels.  Those active

and inactive ingredients do not include benzene, a known human carcinogen dangerous to humans.  Defendants further expressly warrant that the Products are sunscreens used for sun protection, rather than adulterated sunscreens containing dangerous chemicals.

47.   As a direct and proximate cause of Defendant's breach of express warranty, Plaintiff and the Class members have been injured and harmed because they would not have purchased the Products on the same terms if they knew that the Products contained benzene and are not generally recognized as safe.

48.   On June 18, 2021, prior to filing this action, Defendant was served with a pre-suit notice letter that complied in all respects with U.C.C. §§ 2-313 and 2-607.  Plaintiff's counsel sent Defendant a letter advising them that they breached an express warranty and demanded that they cease and desist from such breaches and make full restitution by refunding the monies received therefrom.  A true and correct copy of Plaintiff's counsel's letter is attached hereto as **Exhibit A**.

**COUNT II**
**Breach of Implied Warranty**

49.   Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

50.   Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against Defendant.

51.   This claim is brought under the laws of the state of California.

52.   Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, impliedly warranted that the Products (i) would not contain elevated levels of benzene and (ii) are generally recognized as safe for human use.

53.   Defendant breached the warranty implied in the contract for the sale of the defective Products because they could not pass without objection in the trade under the contract description, the Products were not of fair or average quality

within the description, and the Products were unfit for their intended and ordinary purpose because the Products manufactured, distributed, and sold by Defendant were defective in that they contained elevated levels of carcinogenic and toxic benzene, and as such are not generally recognized as safe for human use.  As a result, Plaintiff and members of the Classes did not receive the goods as impliedly warranted by Defendant to be merchantable.

54.    Plaintiff and members of the Classes purchased the Products in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

55.    The Products were not altered by Plaintiff or members of the Classes.

56.    The Products were defective when they left the exclusive control of Defendant.

57.    Defendant knew that the Products would be purchased and used without additional testing by Plaintiff and members of the Classes.

58.    The defective Products were defectively manufactured and unfit for their intended purpose, and Plaintiff and members of the Classes did not receive the goods as warranted.

59.    As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiff and members of the Classes have been injured and harmed because: (a) they would not have purchased the Products on the same terms if they knew that the Products contained harmful levels of benzene, and are not generally recognized as safe for human use; and (b) the Products do not have the characteristics, ingredients, uses, or benefits as promised by Defendant.

## COUNT III
### Violation of FDUPTA, Fla. Sta. §§ 501.201-213

60.    Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

61.     Plaintiff brings this claim individually and on behalf of the members of the proposed Subclass against Defendant.

62.     This claim is brought under the laws of the state of Florida.

63.     The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts or practice, and unfair or deceptive acts or practices in the conduct of any trade or commerce. Fla. Stat. § 501.204.

64.     Among other purposes, FDUTPA is intended "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202.

65.     FDUPTA can be violated in two ways, both of which are relevant to this case.  First, Defendant has committed a "traditional" violation of FDUPTA by engaging in unfair and/or deceptive acts and practices which caused injury to Plaintiff and members of the Classes.  Second, Defendant has committed a *per se* violation of FDUPTA predicated on a violation of the FDCA.  Specifically, by selling an adulterated product which is *per se* illegal in violation of 21 U.S.C. § 351 and 21 U.S.C. § 352 of the FDCA, designed to protect consumers from harmful and dangerous drugs, Defendant has violated FDUPTA. Fla. Stat. Ann. § 501.203(3)(c) (explaining that a FDUPTA violation may be based on "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices."); *State Farm Mut. Auto. Ins. Co. v. Performance Orthapaedics & Neurosurgery, LLC*, 315 F. Supp. 3d 1291 (S.D. Fla. 2018) (violations of state statutes could serve as statutory predicates for *per se* FDUTPA violations where the statutes proscribed the conduct that FDUTPA was designed to protect against even though they did not explicitly reference FDUPTA or use the terms "unfair or deceptive").

66.     While FDUPTA does not define "deceptive" or "unfair," Florida courts have looked to the Federal Trade Commission's interpretations for guidance.  "[D]eception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."  *Lombardo v. Johnson & Johnson Consumer Companies, Inc.*, 124 F. Supp. 3d 1283, 1287 (S.D. Fla. 2015) (internal quotation marks and citation omitted).  Courts define a "deceptive trade practice" as any act or practice that has the tendency or capacity to deceive consumers.  *Fed. Trade Comm'n v. Partners In Health Care Ass'n, Inc.*, 189 F. Supp. 3d 1356, 1367 (S.D. Fla. 2016).  Courts define an "unfair trade practice" as any act or practice that "offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  *Kenneth F. Hackett & Assocs., Inc. v. GE Capital Info. Tech. Sols., Inc.*, 744 F. Supp. 2d 1305, 1312 (S.D. Fla. 2010).

67.     Defendant engaged, and continues to engage, in conduct that is likely to deceive members of the public. This conduct includes representing in their labels that their sunscreen Products contain only the ingredients listed in the label, which is untrue, and failing to make any mention that the certain sunscreen Products are adulterated with benzene, a known human carcinogen.

68.     As alleged herein, Plaintiff has suffered injury in fact and lost money as a result of Defendant's conduct because she purchased sunscreen Products from Defendant in reliance on Defendant's representation that the ingredients in their sunscreen Products were safe and effective and were not adulterated with benzene.

69.     As alleged herein, Defendant's actions are deceptive and in clear violation of FDUTPA, entitling Plaintiff and the Subclass to damages and relief under Fla. Stat. §§ 501.201-213.

---

70.     By committing the acts alleged above, Defendant engaged in unconscionable, deceptive, or unfair acts or practices, which constitute unfair competition within the meaning of FDUTPA.

71.     Defendant's conduct is substantially injurious to consumers. Consumers are purchasing and, as instructed in the label, "spray[ing] liberally" Defendant's sunscreen Products without knowledge that there is a risk the sunscreen Products may be adulterated with a human carcinogen.  This conduct has caused, and continues to cause, substantial injury to consumers because consumers would not have paid for sunscreens potentially adulterated with benzene but for Defendant's false labeling, advertising, and promotion. Thus, Plaintiff and the putative Subclass have been "aggrieved" (*i.e.*, lost money) as required for FDUTPA standing, and such an injury is not outweighed by any countervailing benefits to consumers or competition.

72.     Indeed, no benefit to consumers or competition results from Defendant's conduct. Since consumers reasonably rely on Defendant's representation of the ingredients contained in their Products' labels and injury resulted from ordinary use of the Products, consumers could not have reasonably avoided such injury.

73.     Further, Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary. Plaintiff is a long-time user of Defendant's sunscreen Products, and she desires to purchase Defendant's Products in the future if she can be assured that the Products are unadulterated and meet the advertising claims.

74.     Accordingly, Defendant is liable to Plaintiff and the Subclass for damages in amounts to be proven at trial, including attorneys' fees and costs.

## COUNT IV
## Fraudulent Concealment

75.     Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint

76.     Plaintiff brings this claim individually and on behalf of the members of the proposed Classes against Defendant.

77.     This claim is brought under the laws of the state of California.

78.     Defendant had a duty to disclose material facts to Plaintiff and the Classes given their relationship as contracting parties and intended users of the Products.  Defendant also had a duty to disclose material facts to Plaintiff and the Classes, namely that it was in fact manufacturing, distributing, and selling harmful products unfit for human use, because Defendant had superior knowledge such that the transactions without the disclosure were rendered inherently unfair.

79.     Defendant possessed knowledge of these material facts.  Since at least mid-2020, numerous recalls put Defendant on notice that adulterated and misbranded products were being investigated for contamination with carcinogens, including benzene.  Further, benzene is not unavoidable in the manufacture of sunscreens.

80.     During this time, Plaintiff and members of the Classes were using the Products without knowing they contained dangerous levels of benzene.

81.     Defendant failed to discharge its duty to disclose these materials facts.

82.     In so failing to disclose these material facts to Plaintiff and the Classes, Defendant intended to hide from Plaintiff and the Classes that they were purchasing and consuming the Products with harmful defects that was unfit for human use, and thus acted with scienter and/or an intent to defraud.

83.     Plaintiff and the Classes reasonably relied on Defendant's failure to disclose insofar as they would not have purchased the defective Products

manufactured sold by Defendant had they known they contained unsafe levels of benzene.

84. As a direct and proximate cause of Defendant's fraudulent concealment, Plaintiff and the Classes suffered damages in the amount of monies paid for the defective Products.

85. As a result of Defendant's willful and malicious conduct, punitive damages are warranted.

## COUNT V
### Unjust Enrichment

86. Plaintiff hereby incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

87. Plaintiff brings this claim individually and on behalf of the members of the proposes Classes against Defendant.

88. This claim is brought under the laws of the state of California.

89. Plaintiff and the Classes conferred a benefit on Defendant in the form of monies paid to purchase Defendant's defective and worthless Products.

90. Defendant voluntarily accepted and retained this benefit.

91. Because this benefit was obtained unlawfully, namely by selling and accepting compensation for products unfit for human use, it would be unjust and inequitable for Defendant to retain the benefit without paying the value thereof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of the alleged Classes, that the Court enter judgment in their favor and against Defendant as follows:

(a) For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiff as the representative for the Classes and Plaintiff's attorneys as Class Counsel;

(b)   For an order declaring the Defendant's conduct violates the causes of action referenced herein;

(c)   For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(d)   For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)   For prejudgment interest on all amounts awarded;

(f)   For an order of restitution and all other forms of equitable monetary relief;

(g)   For injunctive relief as pleaded or as the Court may deem proper; and

(h)   For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated:  June 21, 2021                    Respectfully Submitted,

**BURSOR & FISHER, P.A.**

By:   */s/ L. Timothy Fisher*
                L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile:  (925) 407-2700
E-Mail: ltfisher@bursor.com

*Attorneys for Plaintiff*

**EXHIBIT A**

# BURSOR & FISHER
### P.A.

888 SEVENTH AVENUE
3ʳᵈ FLOOR
NEW YORK, NY 10019
www.bursor.com

ANDREW J. OBERGFELL
Tel: 646.837.7129
Fax: 212.989.9163
aobergfell@bursor.com

June 18, 2021

<u>***Via Certified Mail – Return Receipt Requested***</u>

Neutrogena Corporation
5760 96th Street
Los Angeles, California, 90045

Re:  *Notice and Demand Letter Pursuant to U.C.C. § 2-607;*
     *FDUPTA, Fla. Sta. §§ 501.201-213; and*
     *all other relevant state and local laws*

To Whom It May Concern:

This letter serves as a preliminary notice and demand for corrective action by Neutrogena Corporation ("Neutrogena" or "Defendant") pursuant to U.C.C. § 2-607(3)(a) concerning breaches of express and implied warranties related to our client Shelli French ("Plaintiff") and a class of all similarly situated purchasers (the "Class") of defective sunscreens manufactured and distributed by Neutrogena Corporation.

Our client purchased a bottle of Defendant's Neutrogena Beach Defense Oil Free Body Sunscreen Spray SPF 100 (the "Sunscreen"), and has been purchasing a bottle of this product approximately every three months for the past five years.  Ms. French's most recent purchase was of a bottle bearing the lot number 31420E04 with an expiration date of October 22.  Our clients' Sunscreen was defective in that it contained elevated levels of Benzene, a carcinogenic and toxic chemical impurity that has been lined to leukemia and other cancers.

On May 24, 2021, Valisure, an online pharmacy registered with the FDA, "detected high levels of benzene in several brands and batches of sunscreen products.[1]  This included the Sunscreen purchased by Plaintiff in addition to several other sunscreen products manufactured by Defendant, which contained between 2.64 and 6.26 parts per million of Benzene.[2]  According to Valisure, because the presence of benzene in Defendant's products and other products appears to be the result of contamination (i.e. a manufacturing defect), benzene is not unavoidable in the manufacture of sunscreens, and therefore any significant detection of benzene in such products

---

[1] Valisure, Valisure Citizen Petition on Benzene in Sunscreen and After-sun Care products, May 24, 2021, https://www.valisure.com/blog/valisure-news/valisure- detects-benzene-in-sunscreen/, at 1.

[2] *Id.* at 12.

"should be deemed unacceptable."[3]  The below table shows the products manufactured and distributed by Defendant found by Valisure to contain Benzene (collectively, the "Sunscreens").[4]

| Brand Name | Type | Description | SPF | UPC | Lot | Exp. | Active Pharmaceutical Ingredient(s) | Benzene Avg ppm | % St Dev |
|---|---|---|---|---|---|---|---|---|---|
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 100+ | 100+ | 086800100416 | 04820E04 | 2022-01 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 6.26 6.77* | 7% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 07020E01 | 2023-02 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 5.96 | 7% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 06920E01 | 2023-02 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 5.76 | 5% |
| | | | | | | | | | |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 70 | 70 | 086800100409 | 02320E01 | 2022-12 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 4%, Oxybenzone 6% | 5.30 | 2% |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 | 100 | 086800101444 | 04721E02 | 2023-01 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 5.20 5.59* | 5% |
| | | | | | | | | | |
| Neutrogena | Spray | Invisible Daily Defense Body Sunscreen Broad Spectrum SPF 60+ | 60+ | 086800111542 | 04921E01 | 2024-01 | Avobenzone 3%, Homosalate 10%, Octisalate 5%, Octocrylene 10% | 4.65 5.27* | 4% |
| Neutrogena | Spray | Ultra Sheer Weightless Sunscreen Spray, SPF 100+ | 100+ | 086800100416 | 03120E02 | 2021-12 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 4.11 6.00** | 15% |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 | 100 | 086800101444 | 28020E01 | 2022-09 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 4.01 4.00* | 4% |
| | | | | | | | | | |
| Neutrogena | Spray | Beach Defense Spray Body Sunscreen SPF 50 | 50 | 086800112549 | 25520E01 | 2023-08 | Avobenzone 3%, Homosalate 10%, Octisalate 5%, Octocrylene 10% | 3.52 3.71* | 3% |
| Neutrogena | Spray | Beach Defense Oil-Free Body Sunscreen Spray - SPF 100 | 100 | 086800101444 | 31420E04 | 2022-10 | Avobenzone 3%, Homosalate 15%, Octisalate 5%, Octocrylene 10%, Oxybenzone 6% | 3.08 2.64* | 2% |

In short, the Sunscreens that our client and the Class purchased are worthless, as they contain Benzene, rendering them unusable and unfit for humans.  Defendant violated express and implied warranties made to our clients and the Class regarding the quality and safety of the Sunscreens they purchased.  *See* U.C.C. §§ 2-313, 2-314

Additionally, this letter also serves as notice of violation of FDUPTA, Fla. Sta. §§ 501.201-213, and all other relevant state and local laws.  As a result of Neutrogena's violation of Fla. Sta. §§ 501.201-21, Ms. French sustained injury.

On behalf of our client and the Class, we hereby demand that Neutrogena immediately (1) cease and desist from continuing to sell defective Sunscreens and (2) make full restitution to all purchasers of the defective Sunscreens of all purchase money obtained from sales thereof.

We also demand that Neutrogena preserve all documents and other evidence which refers or relates to any of the above-described practices including, but not limited to, the following:

1.      All documents concerning the packaging, labeling, and manufacturing process for Defendant's Sunscreens;

2.      All documents concerning the design, development, supply, production, extraction, and/or testing of sunscreens manufactured and distributed by Neutrogena;

---

[3] *Id.* at 2, 7-8.

[4] *Id.* at 12.

3.       All tests of sunscreens manufactured and distributed by Neutrogena;

4.       All documents concerning the pricing, advertising, marketing, and/or sale of sunscreens manufactured and distributed by Neutrogena;

5.       All communications with customers involving complaints or comments concerning the sunscreens manufactured and distributed by Neutrogena;

6.       All documents concerning communications with any retailer involved in the marketing or sale of sunscreens manufactured and distributed by Neutrogena;

7.       All documents concerning communications with federal or state regulators; and

8.       All documents concerning the total revenue derived from sales of Defendant's sunscreens.

If you contend that any statement in this letter is inaccurate in any respect, please provide us with your contentions and supporting documents immediately upon receipt of this letter.

Please contact me right away if you wish to discuss an appropriate way to remedy this matter. If I do not hear from you promptly, I will take that as an indication that you are not interested in doing so.

Very truly yours,

*Andrew J. Obergfell*

Andrew J. Obergfell